IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| SENATOR BILL DeSTEPH, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:20-cv-951 (DJN) |
| | ) | |
| v. | ) | |
| | ) | |
| SENATOR MAMIE LOCKE, *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**RESPONSE IN OPPOSITION**
**TO MOTION FOR PRELIMINARY INJUNCTION**

Mark R. Herring
*Attorney General*

Erin B. Ashwell (VSB No. 79538)
*Chief Deputy Attorney General*

Samuel T. Towell (VSB No. 71512)
*Deputy Attorney General*

Jacqueline C. Hedblom (VSB No. 68234)
Blaire Hawkins O'Brien (VSB No. 83961)
*Assistant Attorneys General*

Toby J. Heytens (VSB No. 90788)
*Solicitor General*

Jessica Merry Samuels (VSB No. 89537)
*Assistant Solicitor General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-6731 – Telephone
(804) 371-2087– Facsimile
STowell@oag.state.va.us

The COVID-19 pandemic raises extraordinarily difficult questions for elected officials and other policymakers. The virus is deadly and spreads with devastating ease. Well-intentioned people can unknowingly infect others. While there is reason to be optimistic that distribution of vaccines will begin shortly, wide availability of those vaccines remains months in the future. Millions have been infected in the United States alone, and hundreds of thousands have already died. As the new year begins, we are entering a dark winter in which infection rates and deaths are at their highest level since the start of the pandemic.

It is in this context that the General Assembly will convene for its 2021 Session on January 13. Following the advice and expertise of the Commonwealth's public health officials, Speaker of the House Eileen Filler-Corn and Chair of Senate Rules Mamie Locke[1] have instituted several changes to this year's proceedings. Among those changes is that the Pocahontas Building, which houses offices used on a part-time basis by members of the General Assembly (as well as by full-time career civil servants), will remain closed to the public, as it has been since March 13, 2020, just as have the U.S. Congressional office buildings. Despite Virginia's increasing COVID-19 infection rate and the resulting strain on the Commonwealth's healthcare system, and despite myriad other locations and methods for engagement between legislators and the public, Plaintiff asks this Court to enjoin the General Assembly Defendants' efforts to conduct essential business through methods that will best protect the health of legislators, legislative staff, and the public. At base, a single state legislator is asking the court to use its equitable powers to override state legislative policy regarding a state legislative office building and enmesh itself in the operations of a co-equal branch of government on the other side of the federal partnership. Plaintiff fails to

---

[1] The Defendants—Speaker Filler-Corn, Chair Locke, Clerk Susan Clarke Schaar, Clerk Suzette Denslow, and the Virginia Division of Capitol Police—will be referred to collectively as the "General Assembly Defendants."

demonstrate that he is entitled to this extraordinary remedy because he lacks standing, his claim will not succeed on the merits, and his request does not serve the public interest.

## STATEMENT OF FACTS

1.      Since March of this year, public health authorities have been working to slow the spread of COVID-19, a novel coronavirus that causes a pneumonia-like illness and proves fatal to some percentage of those who contract it. See generally *Lighthouse Fellowship Church v. Northam*, No. 2:20CV204, 2020 WL 2110416, at \*1–3 (E.D. Va. May 1, 2020). To date, more than 77 million people have been infected with COVID-19 worldwide, and 1.7 million have died.[2] Virginia's death toll stands at nearly 5,000 as of December 22, 2020—a number that continues to climb.[3] More than 314,000 COVID-19 cases have been reported in the Commonwealth.[4]

2.      One thing that makes COVID-19 so deadly is the ease with which it spreads. The virus is transferred by in-person interactions, either between people in close contact or through respiratory droplets when an infected person coughs, sneezes, or talks.[5] Infected persons may not show symptoms for days (if at all) and may unknowingly spread the virus to others during their asymptomatic period, which makes controlling the virus' spread even more difficult.[6]

3.      On January 31, 2020, the United States Health and Human Services Secretary declared a public health emergency.  On February 7, Dr. Norman Oliver, the Commissioner of the

---

[2] Johns Hopkins Univ., Center for Systems Science & Engineering, *Coronavirus Resource Center*, https://coronavirus.jhu.edu/map.html (last visited Dec. 22, 2020).

[3] Virginia Department of Health, Coronavirus in Virginia, https://www.vdh.virginia.gov/coronavirus/ (last visited Dec. 22, 2020); Exhibit 1, Declaration of Dr. Laurie Forlano, ¶ 10, attached.

[4] *Id.*

[5] Centers for Disease Control & Prevention, Coronavirus Disease 2019 (COVID-19), *Frequently Asked Questions*, https://www.cdc.gov/coronavirus/2019-ncov/faq.html (last visited Dec. 9, 2020).

[6] *Id.*

Virginia Department of Health, declared COVID-19 a "Communicable Disease of Public Health Threat" for Virginia. In March 2020, both Governor Ralph Northam and the President of the United States declared states of emergency related to COVID-19.

Governor Northam also issued temporary restrictions on daily living designed to address the accelerating spread of the virus by mitigating the number of people sickened and the strain on the Commonwealth's health system. Among the earliest temporary restrictions Governor Northam imposed was limiting certain "brick and mortar retail business…to no more than 10 patrons per establishment." See Executive Order Number Fifty-Three (EO 53) ¶¶ 4-6.[7] The early measures also included a temporary restriction on social gatherings of more than 10 people. Amended Executive Order Number Fifty-Three (Amended EO 53) ¶ 1 (continuing temporary gatherings restriction "as further clarified in Executive Order 55").[8] Because COVID-19 spreads from person to person through close contact, maintaining distance between people is critical.[9] Gatherings that bring people who do not share the same household into proximity with one another, particularly indoors, are strong candidates for COVID-19 transmission.[10] Gatherings and meetings between people from different geographic areas can also contribute to the spread of COVID-19, as individuals can spread the virus from one region to another when they travel by exposing others

---

[7] EO 53 is available at: https://www.governor.virginia.gov/media/governorvirginiagov/executive-actions/EO-53-Temporary-Restrictions-Due-To-Novel-Coronavirus-(COVID-19).pdf. EO 55 is available at: https://www.governor.virginia.gov/media/governorvirginiagov/executive-actions/EO-55-Temporary-Stay-at-Home-Order-Due-to-Novel-Coronavirus-(COVID-19).pdf.

[8] Amended EO 53 is available at: https://www.governor.virginia.gov/media/governorvirginiagov/executive-actions/EO-53-AMENDED---Temporary-Restrictions-Due-To-Novel-Coronavirus-(COVID-19).pdf.

[9] Ex. 1 ¶ 14.

[10] Ex. 1 ¶ 15.

to the virus or contracting it themselves.[11]

4.      The holiday season has brought a dangerous surge in COVID-19 cases in the Commonwealth and throughout the Nation. The United States is now averaging more than 215,000 new COVID-19 cases every day.[12] Over 112,000 people are hospitalized with COVID-19, a dramatic rise from the 30,000 people hospitalized at the beginning of October.[13] Nationally, daily reported cases have increased by 32% over the past three weeks. The seven-day average of daily reported deaths has increased 82.7% over the same period.[14]

The Commonwealth has not been immune. Virginia public health authorities are currently reporting an average of more than 3,600 new COVID-19 cases per day—3 times higher than the previous statewide peak of approximately 1,200 in May.[15] As of December 22, 2020, the current seven-day test positivity rate was 11.7%.[16] By comparison, in October, the statewide test positivity

---

[11] Ex. 1 ¶ 16.

[12] Stephanie Adeline, et al., *Coronavirus Is Surging: How Severe Is Your State's Outbreak?*, (last accessed Dec. 21, 2020) https://www.npr.org/sections/health-shots/2020/09/01/816707182/map-tracking-the-spread-of-the-coronavirus-in-the-u-s

[13] Mel Leonor, *Strain on hospitals intensifies in Virginia; VCU Health Deploys surge capacity plans* (Dec. 19, 2020), https://richmond.com/news/local/strain-on-hospitals-intensifies-in-virginia-vcu-health-deploys-surge-capacity-plans/article_2cb29bf6-256d-55d9-8bbe-318873e74ab6.html#tracking-source=home-trending

[14] Adeline, *Coronavirus Is Surging*, https://www.npr.org/sections/health-shots/2020/09/01/816707182/map-tracking-the-spread-of-the-coronavirus-in-the-u-s

[15] Leonor, *Strain on hospitals intensifies in Virginia*, https://richmond.com/news/local/strain-on-hospitals-intensifies-in-virginia-vcu-health-deploys-surge-capacity-plans/article_2cb29bf6-256d-55d9-8bbe-318873e74ab6.html#tracking-source=home-trending.

[16] Ex. 1 ¶ 22.

rate was approximately 5% (or lower), and in mid-November it was approximately 7%.[17] On December 2, 2020, the University of Virginia Biocomplexity Institute reported that case growth in the Commonwealth was at the highest rate recorded during the pandemic.[18] This trend shows no sign of slowing down and may very well intensify: Across the Commonwealth, 32 out of 35 local health districts are in growth trajectories, including 25 districts where rates are surging.[19] Experts project that the Commonwealth could see a total of 402,731 COVID-19 cases in 2021, with a peak of 98,000 cases during the week of February 7 (the final scheduled week of the General Assembly Session) should current trends continue, and no additional mitigation strategies be implemented.[20] As cases have risen in the Commonwealth, so have hospitalizations, which surpassed 2,000 for the first time on December 9, 2020.[21] Hospitalizations averaged 2,300 during the week of December 14, more than 700 patients higher than the previous peak in the spring.[22] Virginia Commonwealth

---

[17] Ex. 1 ¶ 22.

[18] See UVA Biocomplexity Institute, *Estimation of COVID-19 Impact in Virginia* (Dec. 2, 2020), https://www.vdh.virginia.gov/content/uploads/sites/182/2020/12/COVID-19_VA_Spread_02-December-2020.pdf

[19] See UVA COVID-19 Model Weekly Update (Dec. 18, 2020), https://www.vdh.virginia.gov/content/uploads/sites/182/2020/12/UVA-COVID-19-Model-Weekly-Report-2020-12-18.pdf; Ex. 1 ¶ 21.

[20] *Id.*

[21] Sabrina Moreno, *Northam to announce new COVID-19 restrictions Thursday after Virginia hits record high for new cases* (Dec. 9, 2020), https://richmond.com/news/state-and-regional/update-northam-to-announce-new-covid-19-restrictions-thursday-after-virginia-hits-record-high-for/article_fa22990d-d55e-517a-9915-2aceae3be8e3.html#tracking-source=home-top-story; Ex. 1 ¶ 21.

[22] Leonor, *Strain on hospitals intensifies in Virginia*, https://richmond.com/news/local/strain-on-hospitals-intensifies-in-virginia-vcu-health-deploys-surge-capacity-plans/article_2cb29bf6-256d-55d9-8bbe-318873e74ab6.html#tracking-source=home-trending.

University Hospital has recently been forced to activate its surge capacity as a result of current and expected future strains on its resources in caring for COVID-19 patients.[23]

6.      In response to the rise in cases throughout the Commonwealth, Governor Northam and Commissioner Oliver issued Executive Order Seventy-Two and Order of Public Health Emergency Nine ("EO 72"), which took effect on December 14, 2020.[24]  EO 72 re-imposed certain restrictions which are again targeted at slowing the spread of the virus to avoid overwhelming the health care system. Among other restrictions, in-person gatherings are now limited to 10 persons (down from 250), although larger religious services remain permitted. *Id.* at 12-13.

7.      In the midst of this dramatic rise in COVID-19 infections, preparations for the upcoming session of the General Assembly continue. As they did for both the "veto session" in April and the special session convened in August, both chambers of the General Assembly will alter the procedures under which they convene to protect the health and safety of the legislators, their staff, and the general public.[25] Just as it did in April and in August, the Senate of Virginia will meet at the Science Museum of Virginia, a space sufficiently large to accommodate all forty senators while allowing for social distancing.[26]

After convening in a tent outside the Capitol for the April veto session, the 100-member House of Delegates conducted all of its proceedings, with the exception of the opening day, in the

---

[23] *Id.*; Ex. 1 ¶ 24.

[24] EO 72 is available at https://www.governor.virginia.gov/media/governorvirginiagov/executive-actions/EO-72-and-Order-of-Public-Health-Emergency-Nine-Common-Sense-Surge-Restrictions-Certain-Temporary-Restrictions-Due-to-Novel-Coronavirus-(COVID-19).pdf.

[25] Exhibit 2, Declaration of Mark Vucci, ¶¶ 11, 20-21.

[26] Ex. 2 ¶¶ 11, 20.

83-day special session that began in August virtually.[27] At the strong recommendation of the Virginia Department of Health ("VDH"), the House will continue to hold its proceedings virtually in January.[28] Specifically, VDH "encouraged the use of telephone calls and virtual meetings in place of face-to-face interaction whenever possible" because COVID-19 transmission is "rising in multiple regions of Virginia [ ] increasing the risk for in-person meetings of individuals from around the Commonwealth."[29] House leadership is working to ensure that legislative public meetings remain open and accessible to Virginians. For example, for the first time in the Commonwealth's history, all House of Delegates committee and subcommittee meetings during the regular session will be live-streamed via video conference.[30] Individuals, regardless of where they are located, will be able to testify or offer comments during committee and subcommittee hearings through remote video platforms.[31] An option to submit written comments on pending legislation will also be made available to the public.[32] And General Assembly staff will provide a phone messaging system by which members of the public may call and send messages regarding pending legislation to members of the General Assembly.[33]

   8.   The General Assembly provides and the Clerk of each chamber assigns office space

---

[27] Ex. 2 ¶ 13.

[28] Ex. 2 ¶ 21; Attachment to Ex. 1, Letter from Dr. Oliver to Clerk Suzette Denslow Re: COVID-19 Recommendation to the Virginia House of Delegates.

[29] *Id.*

[30] Ex. 2 ¶¶ 15, 17.

[31] Ex. 2 ¶¶ 16, 22.

[32] *Id.*

[33] *Id.*

in the Pocahontas Building to each of the 140 legislators.[34] The Pocahontas Building also houses the year-round offices of various professionals, including the staff of the Division of Legislative Automated Systems, the House of Delegates Appropriations and Senate Finance and Appropriations Committees, the Division of Legislative Services, House and Senate Operations, the Virginia Division of Capitol Police, and the Virginia Commonwealth University Computer Center, which provides full database administration, data storage, and operations and systems support to the university community.[35]

Constructed in the 1960s, the Pocahontas Building—most recently used as legal offices for the Office of the Attorney General—is densely packed with offices, conference rooms, and hallways, none of which provide for optimal ventilation.[36] Limiting physical entry to the Pocahontas Building promotes social distancing and protects the health and safety of the legislators, their staff, and the other employees whose year-round offices are located in the building and whose functions are critical to the continued operation of the General Assembly Session.

To further limit the potential for spreading the virus, the General Assembly's offices in the Pocahontas Building were closed to all but the legislators themselves and their legislative assistants on March 16, 2020. For the 2021 Session, access to the Pocahontas Building will be limited to the legislators and a single staff member.[37] Like the Congressional office buildings in D.C., the Pocahontas Building has been closed to the public since March 2020, including throughout both

---

[34] Ex. 2 ¶ 3.

[35] Ex. 2 ¶ 4.

[36] Ex. 2 ¶¶ 23-25; Ex. 1 ¶¶ 15, 17.

[37] Ex. 2 ¶¶ 5, 12, 14; *see also* attachment to Complaint.

the April Veto Session, as well as the 83-day special session.[38] Neither Plaintiff nor any other elected member of the General Assembly raised any concern about being unable to communicate with constituents or other members of the public during the course of the veto session or the special session because of the closure of the Pocahontas Building.[39]

In addition to their offices in the Pocahontas Building, each legislator receives an allowance of $1,250 for each month of the calendar year.[40] These stipends are designed to allow legislators to engage their constituents. Access to a legislator's district office, including Plaintiff's, is unaffected by the changes the COVID-19 pandemic has forced on the General Assembly's 2021 proceedings.

9.      Numerous other state legislatures across the country have altered their procedures to mitigate the potential spread of COVID-19. For example, the Illinois legislature has entirely postponed its session twice in light of increasing COVID-19 infections in that state.[41] The New Hampshire legislature convened outside—in New Hampshire in December—to organize and elect its leaders.[42] At least 31 state legislatures have authorized changes in legislative operations or

---

[38] Ex. 2 ¶¶ 5, 12, 14.

[39] Ex. 2 ¶ 18.

[40] Ex. 2 ¶ 3.

[41] Kate Elizabeth Queram, *As Coronavirus Continues, State Lawmakers Debate How to Meet Safely* (Last Accessed December 12, 2020) https://www.route-fifty.com/management/2020/12/coronavirus-continues-state-lawmakers-debate-how-meet-safely/170685/.

[42] *Id.*

expressly authorized remote voting and meetings during the COVID-19 pandemic.[43] It appears that only one legal challenge has been mounted to these changes in legislative operations, which the New Mexico Supreme Court summarily dismissed.[44] And where legislators have declined to take steps to mitigate the spread of the virus, their work has been interrupted by exposures to COVID-19. For example, in both Arizona and Michigan, legislators were forced to cancel meetings and hearings after being exposed to the virus during meetings.[45] And tragically, at least five legislators have died from COVID-19 over the course of the pandemic.[46]

In addition, although Congress has continued to meet, both in person and virtually, as the pandemic has progressed, Congressional offices—in both the Senate and the House, have been

---

[43] National Conference of State Legislatures, *COVID-19: State Actions Related to Legislative Operations* (last accessed Dec. 12, 2020) https://www.ncsl.org/research/about-state-legislatures/covid-19-state-actions-related-to-legislative-operations.aspx

[44] *See Senator Cliff Pirtle, et al. v. Legislative Council Committee of the New Mexico Legislature*, No. S-1-SC-38356 (N.M. June 16, 2020), Order attached as Exhibit 3.

[45] Kate Elizabeth Queram, *As Coronavirus Continues, State Lawmakers Debate How to Meet Safely* (Last Accessed December 12, 2020) https://www.route-fifty.com/management/2020/12/coronavirus-continues-state-lawmakers-debate-how-meet-safely/170685/.

[46] *See, e.g.* Rosa Sanchez, *State senator dies from COVID-19 complications* (Dec. 19, 2020) https://abcnews.go.com/US/minnesota-state-sen-jerry-relph-dies-covid-19/story?id=74816583?amp_js_v=a6&amp_gsa=1&id=74816583&usqp=mq331AQHKAFQArABIA==&cid=referral_taboola_feed; Andrew Graham, *Legislator's son described how COVID-19 came on quickly* (Nov. 15, 2020) https://www.wyomingnews.com/coronavirus/legislator-s-son-describes-how-covid-19-came-on-quickly/article_6bec947d-4c10-501d-979d-c027a83ea323.html; Axios, *New Hampshire speaker of the House dies of COVID-19* (Dec. 10, 2020) https://www.axios.com/new-hampshire-speaker-hinch-covid-die-6fe8ee88-f80b-40f1-86a2-dbb9771aaed9.html?utm_source=facebook&utm_medium=social&utm_campaign=organic&utm_content=1100; KALB, *Gov. Edwards orders flags at half-staff in honor of State Rep. Reggie Bagala* (Apr. 10, 2020) https://www.kalb.com/content/news/Gov-Edwards-orders-flags-at-half-staff-in-honor-of-State-Rep-Reggie-Bagala-569547481.html; Shannon Marvel*, South Dakota lawmaker dies following battle with COVID-19* (Apr. 4, 2020) https://www.inforum.com/news/government-and-politics/5030072-South-Dakota-lawmaker-dies-following-battle-with-COVID-19.

closed to the public since March 12, 2020.[47]  Representatives and Senators have, therefore, had to modify their methods of communication and providing constituent services to ensure they continue uninterrupted.[48]

10.     Plaintiff is a member of the Senate of Virginia. (Compl. ¶ 1.) As a member of the Senate, Plaintiff has the use of an office in the Pocahontas Building. Plaintiff alleges that, without public access to the Pocahontas Building, he will be entirely unable "to conduct vital constituent service by meeting with members of the public" during the 2021 General Assembly Session. (Compl. ¶ 16.) Plaintiff contends that this restriction will violate his constituents' rights to speak freely and to petition the government pursuant to the First Amendment to the United States Constitution, and Article 1 § 12 of the Virginia Constitution. Although he notes that certain procedures short of restricting public access could be adopted at the Pocahontas Building, (Compl. ¶ 19), Plaintiff simply asks the Court to enter an injunction against the General Assembly Defendants, leaving it to the Court to fashion the appropriate relief. (Compl. at 7.)

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008). Rather, "courts must balance the competing

---

[47] Laurie Kellman, *No visitors; Congress hunkers down against coronavirus* (last accessed Dec. 18, 2020) https://apnews.com/article/e7b9d39fd06ed228e7b406d921dd8417. Although the closure permits "official visitors" to enter Congressional office buildings, such visitors are limited to members of the Presidential administration, or witnesses who are testifying before a Congressional committee meeting in the building. Members of the public without such an official role may not enter any Congressional office at this time.

[48] *See, e.g.*, Representative Rob Wittman, *Coronavirus* (last accessed Dec. 18, 2020) https://wittman.house.gov/coronavirus/ (listing 1.6 million constituent contacts, 18 telephonic townhalls, and describing how constituents may contact their representative given the closure of the Washington D.C. offices); Senator Chris Van Hollen, *Contacting Senator Van Hollen's Office* (last accessed Dec. 18, 2020) https://www.vanhollen.senate.gov/ (noting that offices are closed to the public, but that constituents may contact the Senator by telephone or email).

claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* (citation omitted). In all cases, the party seeking injunctive relief (here, Plaintiff) "must establish [1] that [he is] likely to succeed on the merits, [2] that [he is] likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in their favor, and [4] that an injunction is in the public interest." *Id.* at 20.

## ARGUMENT

A state senator is asking this court to use its equitable powers on an emergency basis to overturn a legislative operational decision expressly granted to the legislature by the Constitution of Virginia. This extraordinary intrusion into a coequal branch of government's internal decision-making by the judiciary—let alone the federal judiciary—is unwarranted. Plaintiff does not have standing to seek his proposed remedy and the defendants are shielded by legislative immunity. Further, Plaintiff's request for an injunction will not succeed on the merits, and the equities strongly favor the General Assembly Defendants' actions, particularly where so many alternative methods of communicating with legislators—outside of the cramped confines of the Pocahontas Building—are available.

## I. Plaintiff cannot show a substantial likelihood of success on the merits.

### A. Plaintiff does not have standing.

The standing requirement "is a threshold jurisdictional question that ensures a suit is appropriate for the exercise of the federal courts' judicial powers." *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 343 (4th Cir. 2017) (internal quotation omitted). The "'irreducible constitutional minimum' of standing consists of three elements. The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Spokeo*, 136 S. Ct. at 1547 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). To establish constitutional

standing, a plaintiff must prove sufficient facts to satisfy each of these elements. *Id.* Here, Plaintiff fails to establish standing because the Complaint relies on alleged injuries to the rights of others and, therefore, does not show that Plaintiff has suffered an actual injury.

"[I]njury in fact [is] the 'first and foremost' of standing's three elements." *Spokeo*, 136 S. Ct. at 1547 (quoting *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 103 (1998)). The injury-in-fact requirement "assure[s] that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 542 (1986)). "[T]he 'injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." *Lujan*, 504 U.S. at 563 (internal quotation omitted).

The First Amendment outlines freedoms belonging to the people, not to government officials. And where the Supreme Court has addressed the application of First Amendment rights to legislative activities, the Court has made it clear that those rights belong to the people represented, and the legislator has no personal or individual interest. *See Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 125-26 (2011) (holding that law prohibiting legislators from casting votes on topics raising conflicts of interest did not unconstitutionally burden legislator's First Amendment rights because those rights belonged to the people). The *Carrigan* Court reached its conclusion because the plaintiff members of Congress had not been "deprived of something to which they *personally* [were] entitled," but rather of something possessed "as trustee for his constituents..." *Id.* (emphasis in original).

Here, Plaintiff alleges that the "Pocahontas Building is a traditional forum office building open to members of the public…to allow the public access to its elected legislative members."

(Compl. ¶¶ 10, 14.) He further alleges that "the right to assemble and address lawmakers at the state and federal level" is protected by the First Amendment to the United States Constitution and Article I § 12 of the Virginia Constitution. (Compl. ¶¶ 17-18.) Finally, Plaintiff claims that restricting access to the Pocahontas Building "deprive[s] [him] or his constituents open access to government and the right to peacefully assemble in person…" (Compl. ¶ 21.) The salient commonality among these allegations is that the injury Plaintiff describes is not his own. Plaintiff's membership in the General Assembly does not confer the ability to represent his constituents' First Amendment speech and assembly interests as a litigant in court.

Plaintiff attempts to side-step the standing issue by claiming that he will be "deprived of his ability to conduct vital constituent service," or *his* "open access to government and the right to peacefully assemble…" (Compl. ¶¶ 16, 21.) But, unlike members of the public, Plaintiff will continue to have access to an office in the Pocahontas Building, from which he may speak and meet with constituents telephonically or virtually, using technology provided by the Commonwealth and the General Assembly.

In addition, the potential injuries Plaintiff describes in the Complaint are merely "conjectural or hypothetical," rather than the "concrete and particularized" injury the Supreme Court demands. *Lujan*, 504 U.S. at 560. Plaintiff alleges he will be unable to meet with constituents, but he makes no complaint about having been unable to do so over the past nine months when the Pocahontas Building has also been closed. Plaintiff does not explain how circumstances will be different during the 2021 session. In the absence of such an explanation, Plaintiff's injuries are merely speculative.

Plaintiff's allegations that his constituents' First Amendment rights will be harmed by the maintenance of access restrictions to the Pocahontas Building are not sufficient to establish that

he has sustained an actual injury sufficient to create Article III standing. Accordingly, Plaintiff's request for a preliminary injunction should be denied.[49]

**B.      Defendants are shielded by immunity.**

**1.      Defendants have legislative immunity.**

Not only does Plaintiff lack standing to bring his claim, but he is also barred by the doctrine of legislative immunity. Our legal system has broadly recognized the right "'of legislators to be free from…civil process for what they do or say in legislative proceedings.'" *EEOC v. Wash. Suburban Sanitary Comm'n*, 631 F.3d 174, 180 (4th Cir. 2011) (quoting *Tenney v. Brandhove*, 341 U.S. 367, 372 (1951)). This immunity in federal court extends to lawsuits alleging constitutional violations against state legislators. *Tenney*, 341 U.S. at 372-376. The Fourth Circuit has described the importance of legislative immunity as follows:

> As members of the most representative branch, legislators bear significant responsibility for many of our toughest decisions, from the content of the laws that will shape our society to the size, structure, and staffing of the executive and administrative bodies carrying them out. Legislative immunity provides legislators with the breathing room necessary to make these choices in the public's interest, in a way uninhibited by judicial interference and undistorted by the fear of personal liability. It allows them to focus on their public duties by removing the costs and distractions attending lawsuits. It shields them from political wars of attrition in which their opponents try to defeat them through litigation rather than at the ballot box… Legislative immunity thus reinforces representative democracy, fostering public decisionmaking by public servants for the right reasons.

_____

[49] Plaintiff also does not allege that he has standing to represent the rights of his constituents as a third party. "'[O]rdinarily, one may not claim standing … to vindicate the constitutional rights of some third party.'" *Heap v. Carter*, 112 F. Supp. 3d 402, (E.D. Va. 2015) (quoting *Singleton v. Wulff*, 428 U.S. 106, 113 (1976)). The Supreme Court considers two factual elements in determining whether this principle should apply: (1) the relation of the litigant to the person whose right he seeks to assert; and (2) the ability of the third party to assert his own rights. *Singleton*, 428 U.S. at 114-15. "Even where the relationship is close, the reasons requiring persons to assert their own rights will generally still apply." *Id.* Here, Plaintiff identifies no barriers to his constituents taking action to assert their rights. Plaintiff does not have third party standing.

*Wash. Suburban Sanitary Comm'n*, 631 F.3d at 181 (internal quotation omitted).

Moreover, "[w]here…the suit would require legislators to testify regarding conduct in their legislative capacity, the doctrine of legislative immunity has full force...[and] applies whether the suit is for damages or for injunctive relief." *Schlitz v. Virginia*, 854 F.2d 43, 45 (4th Cir. 1988) (*overruled on other grounds by Berkley v. Common Council of the City of Charleston*, 63 F.3d 295, 303 (4th Cir. 1995)). Importantly, the immunity protects legislators not merely from liability, but also from the legal process itself. *Tenney*, 341 U.S. at 377 ("The privilege would be of little value if they could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them…").

This case falls squarely into the category of actions for which the General Assembly Defendants have legislative immunity.[50] The Constitution of the Commonwealth of Virginia assigns the General Assembly the discretion to determine its own rules and procedures. Va. Const. art. IV § 7 ("Each house shall select its officers and settle its rules of procedures."). In carrying out that obligation, each house of the General Assembly has assigned its leaders to determine the appropriate use of the General Assembly's facilities. Specifically, the Rules of the Senate of Virginia provide that "[t]he Chair of the Committee on Rules, in consultation with the Clerk shall consider and determine all matters concerning…the utilization of the facilities available to the Senate and its membership." Rule 19(c) of the Senate of Virginia, attached as **Exhibit 4.** Moreover, Rule 85 of the House of Delegates specifically emphasizes the importance of "tak[ing] all

---

[50] The doctrine of legislative immunity protects not only legislators but also their assistants and staff who assist legislators engaged in legislative acts. *Dombrowski v. Eastland*, 387 U.S. 82, 85 (1967) ("[T]his doctrine is less absolute, although applicable, when applied to officers or employees of a legislative body, rather than to legislators themselves."). Accordingly, all Defendants to this action are entitled to the same legislative immunity.

reasonable precautions to ensure the safety of every member, full and part-time employee, page, intern, visitor, and guest of the Virginia House of Delegates." Rule 85 of the Virginia House of Delegates, attached as **Exhibit 5**.

The Virginia Constitution grants the General Assembly authority to determine its procedures and rules. Each house of the General Assembly, by adopting its rules and procedures at the time it convened, assigned certain responsibilities—including managing the use of the legislature's facilities—to its leadership.[51] There can be no doubt, therefore, that the actions at the heart of Plaintiff's Complaint are "legislative acts" for purposes of the legislative immunity doctrine.[52] Legislative immunity is particularly important in the context of the relief Plaintiff seeks. Plaintiff asks this Court to insert itself into tasks that the Virginia Constitution expressly assigns to the legislature. Were legislative immunity not to bar this suit, the doors of the Court would be forced open to any number of challenges asking for review and management of the rules of the state legislature, brought by individuals—like Plaintiff—who participated in the lawmaking process that led to their adoption, and are now disgruntled. Plaintiff's suit—filed nine months after the subject restrictions were put into place, after the legislature completed two sessions, and just one month before the upcoming 2021 session—appears to be an effort challenge the leadership of the General Assembly "through litigation rather than at the ballot box." *Wash. Suburban Sanitary*

---

[51] Plaintiff was elected to the Senate of Virginia in 2016 and participated in the adoption of the Senate Rules governing the 2021 session.

[52] Were this case to have involved Congress, rather than a state legislature, the separation of powers doctrine would bar it for a similar reason. *See Nixon v. United States*, 506 U.S. 224, 228 (1993) ("A controversy is non-justiciable—*i.e.*, involves a political question—when there is a textually demonstrable constitutional commitment of the issue to a coordinate political department."). And notably, Congress has done just what the General Assembly has done here: closed its office buildings. Were the Court to consider an identical action against the leadership of the United States Congress, therefore, it would be a non-justiciable political question. Principles of comity argue for noninvolvement in this matter as well.

*Comm'n*, 631 F.3d at 181. Legislative immunity, therefore, bars this action, and it should be dismissed for want of jurisdiction. For the same reason, the Complaint will not succeed on its merits, and a preliminary injunction should be denied.

### 2.     The General Assembly Defendants have sovereign immunity.

Plaintiff cannot bring his stated claim against the General Assembly Defendants because, as officers and agencies of the government of the Commonwealth of Virginia, they are protected from this suit by the Commonwealth's sovereign immunity.

To be sure, by removing this action to this Court the General Assembly Defendants waived the specific Eleventh Amendment immunity that would have otherwise barred suit in federal court. *Drew v. Va. Commonwealth Univ.*, No. 3:17-cv-429-JAG, 2018 U.S. Dist. LEXIS 50944, *4 (E.D.Va. March 27, 2018). But "[r]emoval to federal court [ ] did not waive [the General Assembly Defendants'] broader state sovereign immunity" that applies in both federal and state court alike. *Id.*; see *Passaro v. Virginia*, 935 F.3d 243, 247 (4th Cir. 2019) (reaffirming that "where a state retains its sovereign immunity from suit in state court, it does not lose that immunity by removing the case to federal court"). "As a general rule, the Commonwealth is immune both from actions at law for damages and from suits in equity to restrain governmental action or to compel such action." *Alliance to Save the Mattaponi v. Commonwealth Dep't of Envtl. Quality ex rel. State Water Control Board*, 621 S.E.2d 78 (2005). This broadly applicable immunity encompasses claims against agencies and officers of the Commonwealth. *See Rector & Visitors of the University of Virginia v. Carter*, 591 S.E.2d 76, 78 (2004). In fact, the Commonwealth "waives its state sovereign immunity only when a statute 'has explicitly and expressly announced such a waiver.'" *Drew*, 2018 U.S. Dist. LEXIS 50944 at *4 (quoting *Ligon v. Cty. of Goochland*, 689 S.E.2d 666, 669 (2010)).

The Commonwealth has not waived its immunity for speech matters such as this. Perhaps the clearest evidence of the absence of a statutory waiver is the fact that the General Assembly considered, but declined to adopt, a statutory waiver during the August 2020 special session.[53] Because the General Assembly Defendants have sovereign immunity from this suit had it been litigated in state court, they retain that immunity from suit in this Court. Accordingly, Plaintiff's claims cannot succeed on the merits and the request for a preliminary injunction should be denied.

### C.   Plaintiff seeks a remedy without identifying a cause of action.

The Complaint lists one count, which it identifies only as "Injunction." (Compl. at 3.) But it is well-settled that "injunctive relief is a remedy and not a cause of action and it is improper to frame a request for an injunction as a separate cause of action." *Bloch v. Exec. Office of the President*, 164 F. Supp. 3d 841, 862 (E.D. Va. 2016) (internal quotation omitted). In the absence of a cause of action, a claim that only requests injunctive relief "must be dismissed for failure to state a claim." *Id.* at 863.

Here, although the Complaint points to the First Amendment to the United States Constitution, the provisions of the Bill of Rights do not create a cause of action against states or their officials. Moreover, the Complaint provides the Court with no guiding principles as to how or why it should exercise its equitable jurisdiction. Plaintiff vaguely suggests that alternatives short of a complete re-opening of the Pocahontas Building are available to the Court to fashion some kind of equitable remedy.  But Plaintiff identifies no basis in the law for the Court to design such a remedy, which would require substantial changes—and significant additions—to the General Assembly's staffing and other resources in the 2021 session. Instead, Plaintiff asks the Court to

---

[53]   *See* Virginia's Legislative Information System, House Bill 5013, https://lis.virginia.gov/cgi-bin/legp604.exe?202+ful+HB5013H1 (last accessed Dec. 18, 2020).

insert itself in the management of facilities operated by the legislature. Without even identifying a cause of action, Plaintiff suggests that individual legislators should be able to sue on every occasion they disagree with even the purely administrative decisions of leadership. Such a state of play would invite lawsuit after lawsuit and ultimately grind the legislature's work to a halt.

Similarly, Article 1 § 12 of the Virginia Constitution is not self-executing. Plaintiff may not bring a private cause of action pursuant to the Virginia Constitution unless the section of the constitution on which he relies is self-executing. *Gray v. Va. Secy. of Transp.*, 276 Va. 93, 106 (2008). A right secured by the Virginia Constitution creates a private right of action only when it is self-executing, without needing a statute in order to execute the provisions into an enforceable law. *Id.* "A constitutional provision is self-executing when it expressly so declares." *Robb v. Shockoe Slip Foundation*, 228 Va. 678, 681 (1985). To be self-executing, it must

> suppl[y] a sufficient rule by means of which the right given may be
> employed and protected, or the duty imposed may be enforced; and
> it is not self-executing when it merely indicates principles, without
> laying down rules by means of which those principles may be given
> the force of law.

*Id.* at 682 (internal quotation omitted).

Article I § 12 does not have an express statement that it is self-executing. It is a general statement of principles and does not explain how it should be enforced. Instead, it prohibits conduct, but only by the General Assembly in law-making, not in internal policymaking, over which the Constitution gives the General Assembly plenary authority. *See* Va. Const. art IV § 7 ("Each house shall select its officers and settle its rules of procedure."). The Circuit Court of the City of Richmond recently considered this argument and—in denying the plaintiffs' request for a temporary restraining order—agreed that Article 1 § 12 is not self-executing. *See Va. Student Power Network v. City of Richmond*, 105 Va. Cir. 259, 260 (Richmond Cir. Ct. 2020).

20

Plaintiff does not state a cause of action. Instead, he asks only for a remedy that is outside of the capacity of the Court's equitable jurisdiction to fashion. The Complaint will not succeed on the merits, and it should be dismissed.

**D.     Use of the Pocahontas Building is subject to the control of the General Assembly.**

As an elected member of the General Assembly, Plaintiff receives from the Commonwealth the use of an office space in the Pocahontas Building. Plaintiff has no property or possessory right to this office space; his access is derivative of his status as a legislator, and his use is limited to those activities permissible under the rules of the General Assembly. Similarly, not all public spaces in and around the Capitol are open for legislators' use simply by virtue of their representative membership in the General Assembly. Legislators cannot, for example, use or even speak at will on the floor of either chamber. As the Supreme Court observed in *Perry Education Association v. Perry Local Educators' Association*, "the First Amendment does not guarantee access to property simply because it is owned or controlled by the government." 460 U.S. 37, 46 (1983). Legislators do not have the right to use this space for whatever purpose they desire. Such parameters do not implicate the First Amendment, as they do not restrict protected speech.

Plaintiff has innumerable other locations and technological means by which he may interact with the public during the 2021 General Assembly Session. Plaintiff's allegation that the closure of the Pocahontas Building will deprive him of his "ability" to "meet with members of the public" is plainly untrue. (Compl. ¶ 16.) While Plaintiff may prefer meeting members of the public in the Pocahontas Building (an assertion he has not made), he does not have a Constitutional right to do so. Moreover, if Plaintiff finds he cannot meet with his constituents because he has not availed himself of the innumerable other options available to him, that choice is his own.

**E.      Restricting access to the Pocahontas Building survives constitutional scrutiny.**

Even assuming an analysis under the First Amendment were required—which it is not—the action complained of here easily survives. "Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 799-800 (1985). "The Supreme Court of the United States long has recognized that states may regulate the 'time, place, and manner of expression' without running afoul of the First Amendment, subject to certain requirements." *White Coat Waste Project v. Greater Richmond Transit Co.*, 463 F. Supp. 3d 661, 695 (E.D. Va. 2020).

Under the circumstances of the COVID-19 pandemic, the General Assembly Defendants' decision to restrict public access to the Pocahontas Building is content-neutral and reasonable in time, place and manner. To the extent Plaintiff's claims implicate the First Amendment, therefore, the General Assembly Defendants' actions clear constitutional scrutiny.[54]

**1.      In limited public forums and nonpublic forums, the Government may place restrictions on speech, so long as they are reasonable and content-neutral.**

The Supreme Court has recognized three categories of government-controlled spaces that guide the level of scrutiny applicable to a restriction on the exercise of First Amendment rights. *Minn. Voters Alliance v. Mansky*, 138 S. Ct. 1876, 1885 (2018). First, as to traditional public

---

[54] The Complaint purports to state claims under the First Amendment to the United States Constitution and Article I, § 12 of the Virginia Constitution.  The Supreme Court of Virginia has "declare[d] that Article I, § 12 of the Constitution of Virginia is coextensive with the free speech provisions of the federal First Amendment." *Elliott v. Commonwealth*, 267 Va. 464, 473-74, 593 S.E.2d 263, 269 (2004). Accordingly, Plaintiff's claims arising under federal and state law will be analyzed together.

forums, the government "may only sparingly regulate speech on government property 'that has traditionally been available for public use,' and such regulation 'is subject to the highest scrutiny.'" *White Coat Waste Project*, 463 F. Supp. 3d at 695 (quoting *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992)).

Second, a government "may create a public forum 'if government property that has not traditionally been regarded as a public forum is intentionally opened up for that purpose.'" *Id.* (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009)). In a designated public forum, two levels, the "internal" standard and the "external" standard, of scrutiny apply. *Goulart v. Meadows*, 345 F.3d 239, 250 (2003). If the "government excludes a speaker who falls within the class" to which a designated public forum is generally made available, the internal standard provides that the government's action is subject to strict scrutiny. *Id.* (quoting *Warren v. Fairfax Cnty.*, 196 F.3d 186 (4th Cir. 1999)). The "external standard," in contrast, places limits on the government's designation of "the class for whose benefit the forum has been opened…." *White Coast Waste Project*, 463 F. Supp. 3d at 695-96. Where the Court, therefore, considers general restrictions on a limited public forum, they need only be "viewpoint neutral and reasonable in light of the objective purposes served by the forum" to survive constitutional scrutiny. *Goulart*, 345 F.3d at 250. This "external standard" is the same standard applicable to restrictions on speech in the third category of government-controlled space: the nonpublic forum. *Id.*

> **2.    The Pocahontas Building is a limited public or nonpublic forum, and the proposed restriction is generally applicable and content-neutral.**

The General Assembly's offices are not a traditional public forum—such as a park, street, or sidewalk. The Pocahontas Building is—at most—a limited public forum subject to reasonable restrictions on the time, place, and manner of First Amendment activity. Its closure to the public arguably converted the Pocahontas Building into a nonpublic forum. *See Archdiocese of Wash. v.*

*Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 323 (D.C. Cir. 2018) ("[A] state is not required to indefinitely retain the open character of a designated public forum…it may instead choose to convert a designated public forum back into a non-public forum because the government retains the choice regarding the status of its forum.").

Ultimately, however, this distinction is without meaning because the restriction is content-neutral. All members of the public, no matter the message they wish to convey, are subject to the restriction on access to the Pocahontas Building. Because the burden imposed by the restriction is generally applicable, the Court should apply intermediate constitutional scrutiny in analyzing the restriction under the First Amendment. *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 662 (1994).

**3**.     **The closure of the Pocahontas Building to the public during the COVID-19 pandemic is reasonable as to time, place and manner.**

A content-neutral regulation should be sustained if "it furthers an important or substantial government interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *United States v. O'Brien,* 391 U.S. 367, 377 (1968). Stated differently, "[e]xpression, whether oral or written or symbolized by conduct, is subject to reasonable time, place, or manner restrictions." *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984).

**a.  Time**

COVID-19 cases in Virginia are at an all-time high. Public health authorities are currently reporting an average of 3,600 new COVID-19 cases per day, about 3 times higher than the previous statewide peak of approximately 1,200 in May. Hospitals in the Commonwealth are beginning to see significant numbers of COVID-19 patients. Despite public health guidance to the contrary, experts fear that gatherings over the holidays will continue to exacerbate this trend.

As they have throughout the pandemic, the General Assembly Defendants considered these current circumstances and the advice of public health experts in deciding that the Pocahontas Building should not be open to the public during the General Assembly Session. And the closure will only last as long as circumstances on the ground require, which—given that distribution of a vaccine is now underway—may only be a few more months. The restriction, therefore, is reasonable because it is temporary and directly founded in the prevailing facts surrounding the dangers of COVID-19 as it spreads, essentially unchecked, throughout the Commonwealth.

### b. Place

The General Assembly Defendants' decision to restrict access to the Pocahontas Building is reasonable as to place for three reasons: (1) Plaintiff has any number of alternative locations where and means by which he may communicate with the public; (2) the age and condition of the Pocahontas Building make it particularly ill-suited for limiting the spread of the disease; and (3) allowing the general public into the building will only endanger staff without facilitating the First Amendment activity Plaintiff envisions will take place.

First, Plaintiff's allegation that he will be "deprived of his ability" to meet with the public does not survive even the most superficial scrutiny. The General Assembly Defendants have not directed members not to meet; they simply said that meetings must occur in a location other than the single square block of downtown Richmond occupied by the Pocahontas Building. Constituent meetings may happen at any other place Plaintiff secures. He receives a stipend from the General Assembly for these very purposes. Meetings may happen in any number of other physical locations better suited for facilitating meetings between Plaintiff and the public,[55] and for social distancing

---

[55] Notably, the Pocahontas Building is located across the street from the Capitol Building— to the closure of which Plaintiff does not object—but three miles from the Science Museum of Virginia, where the Virginia Senate will meet and conduct its business during the 2021 Session.

and other virus-mitigation strategies. They may also happen telephonically or virtually, using technology funded and facilitated by the General Assembly. And it would appear that these alternatives have proven adequate for Plaintiff, given that the Pocahontas Building has been closed for nine months—during which the General Assembly has been in session for a total of 84 days— but Plaintiff has made no prior claim of being unable to meet with his constituents or the public.

Second, the age, layout, and condition of the Pocahontas Building render it a poor meeting place during a pandemic. The building is nearly 60 years old. It was not designed for public access; it is a temporary location for the General Assembly during the construction of their permanent facility. Its prior incarnation was as the comparatively secure and nonpublic Office of the Attorney General. It is filled primarily with small offices and conference rooms, narrow hallways and stairwells, small elevators and low ceilings. The Pocahontas Building, unlike large courtrooms, city council auditoriums, or even DMV waiting rooms, consists almost entirely of the type of small, poorly ventilated spaces that have dramatically contributed to the spread of the disease.

Finally, the benefits of allowing members of the public into the Pocahontas Building are greatly outweighed by the dangers exposure to COVID-19 could pose to the personnel required to work there. Many legislators will not, in fact, be present at the Pocahontas Building during this session. The Senate will be meeting at the Science Museum of Virginia, and the House of Delegates will convene virtually. The people who—with certainty—will be there during the session are the career support staff, particularly information technology professionals, who manage the servers and other infrastructure facilitating the remote and off-site sessions. Those staff members must be on-site to complete their work, and if the building were to be closed for cleaning, or if staff had to quarantine following an exposure to the virus, no one would be available to operate the systems or repair them if something were to go offline. The stability of these systems is

essential to the General Assembly's ability to complete the work of the 2021 session. It is clear, therefore, that requiring the Pocahontas Building to be open to the public—even in a limited capacity—will not actually facilitate the First Amendment activity Plaintiff describes in his Complaint, but rather will endanger the General Assembly's ability to conduct the Session at all. Restricting access to the public while pandemic conditions persist, therefore, is reasonable.

### c. Manner

Finally, the restrictions the General Assembly Defendants placed on access to the Pocahontas Building are reasonable in manner. Legislators across the country have responded to the COVID-19 pandemic by temporarily closing their physical doors to protect their members' ability to complete their business. This includes the U.S. Senate and House of Representatives, the office buildings of which closed to the public on March 12, 2020 and remain closed today. First Amendment activities have not stopped in Washington, but members of Congress have shifted how they provide those opportunities to their constituents.

Moreover, Plaintiff suggests that "less restrictive options," such as "requiring appointments and capacity restrictions," are available, but he does not substantiate those claims. First, the Supreme Court does not require the government to employ the "least-restrictive" means; a restriction need only be "narrowly tailored to serve a significant governmental interest." *Bd. Of Trustees v. Fox*, 492 U.S. 477-78 (1989). This distinction is particularly noteworthy in light of the Supreme Court's recent decision in *Roman Catholic Diocese v. Cuomo*, 208 L. Ed. 2d 206, ___ S. Ct. __ (2020), in which the Court applied strict scrutiny to an emergency regulation that discriminated against religious services, rather than the intermediate standard applicable to the content-neutral, generally applicable regulation here.

27

Second, contrary to Plaintiff's assertion, the science tells us that an extended conversation in a small conference room poses a higher risk of transmitting the virus from than standing in a line for a short time at a grocery store. And the risks are heightened where, by the very nature of the legislature, the people involved in those extended interactions come from across the Commonwealth, undermining public health efforts to contain the spread of the virus within geographic areas.

In reality, there are no less restrictive means to ensure the safety and health of the individuals who work in the Pocahontas Building, nor of the other legislators who will be using their offices in the Building. To accommodate appointments with proper social distancing would require there to be personnel in the Building to monitor and manage traffic in stairwells, hallways, and elevators, as well as disinfect high-touch surfaces. No such personnel exists. Any staff who can operate remotely is currently doing so, and even the Senate Digital Services staff, who operates the servers which will manage all of the off-site Senate meetings during Session, is working in the building at one-third capacity on a rotating basis.

The Supreme Court agrees that the Commonwealth's interest in containing the spread of COVID-19 is compelling. *Roman Catholic Diocese v. Cuomo*, 208 L. Ed. 2d 206, ___ S. Ct. __ (2020). And, given the alternative forms of communication available, the practical difficulties of safely managing foot traffic in the Pocahontas Building, and the temporary duration of the restriction, the decision by the General Assembly to close its own offices to the public is a reasonable, content-neutral, generally applicable restriction. It survives constitutional scrutiny, and Plaintiff's claim cannot succeed on the merits.

II.     **Plaintiff has not shown that he is likely to suffer irreparable harm.**

The Supreme Court has specifically rejected the argument that a preliminary injunction may be entered based "only on a possibility of irreparable harm." *Winter*, 555 U.S. at 21 (internal quotation marks omitted). Instead, Plaintiff, like all parties seeking such relief—must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Id.* at 22. Plaintiff cannot do so here. Indeed, the same restriction Plaintiff complains of now was in place for the General Assembly's April veto and August special sessions, yet Plaintiff does not allege that he suffered irreparable harm as a result of the restriction at those times. In fact, Plaintiff did not take issue with the restriction at all until filing this action just this month. Plaintiff claims he will be unable to meet with constituents if he cannot do so in the close confines of an aging office space in downtown Richmond. But Plaintiff's choice not to adapt—as the rest of the country has—to pandemic conditions cannot manufacture a First Amendment violation.

Instead, it is Plaintiff's requested remedy—that the Pocahontas Building be opened to the public during the pandemic—that poses the risk of irreparable harm. Should a legislator be unable to participate in the session due to illness or quarantine following an unnecessary exposure to the virus in the Pocahontas Building, that legislator's constituents would be denied their right to representation. Similarly, should the Division of Legislative Services, DLAS, or House or Senate Operations staff be exposed and forced to vacate the building, the stability of the technological systems underlying the General Assembly's 2021 session would be in jeopardy. Disruptions to legislative work during this period of crisis pose an obvious danger of irreparable harm.

Plaintiff fails to show that he will be irreparably harmed by the continuing closure of the Pocahontas Building, and the relief he seeks risks irreparable harm to others and the 2021 session.

**III.    An injunction would not serve the public interest and the equities weigh against one.**

Plaintiff fails to establish that either the balance of the equities or the public interest—which tend to "merge when the Government is the opposing party"—weigh in favor of injunctive relief. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Ensuring that the public can petition their legislators is undeniably in the public interest. But so is securing the ability of those legislators to complete their work—providing for the Commonwealth's essential needs in the context of a global health and economic crisis. The General Assembly Defendants' actions to restrict physical public access to their offices, while simultaneously increasing telephonic and virtual access to both hearings, meetings, and individual legislators, serve both of those goals. And the closure of the building does not restrict the legislators' ability meet with the public in innumerable other locations.

Allowing public access to the Pocahontas Building now—as Virginia reaches its highest peak of hospitalizations in the pandemic, forcing the flagship hospital of the Richmond region to activate its surge capacity—will only endanger essential staff while facilitating little of the First Amendment activity Plaintiff envisions. An injunction is not in the public interest.

## CONCLUSION

The motion for a preliminary injunction should be denied.

Dated: December 23, 2020          Respectfully submitted,

                    **SENATOR MAMIE LOCKE**
                    **SPEAKER EILEEN FILLER-CORN**
                    **SUSAN CLARKE SCHAAR**
                    **SUZETTE DENSLOW**
                    **VIRGINIA DIVISION OF CAPITOL POLICE**

                 By:   */s/ Blaire Hawkins O'Brien*
                      Blaire Hawkins O'Brien (VSB No. 83961)
                      *Counsel for Defendants*

Mark R. Herring                 Toby J. Heytens (VSB No. 90788)
  *Attorney General*                *Solicitor General*

Erin B. Ashwell (VSB No. 79538)      Jessica Merry Samuels (VSB No. 89537)
  *Chief Deputy Attorney General*       *Assistant Solicitor General*

Samuel T. Towell (VSB No. 71512)     Office of the Attorney General
  *Deputy Attorney General*           202 North Ninth Street

Jacqueline C. Hedblom (VSB No. 68234)  Richmond, Virginia 23219
Blaire Hawkins O'Brien (VSB No. 83961)  (804) 371-0977 – Telephone
  *Assistant Attorneys General*       (804) 371-2087– Facsimile
                           bo'brien@oag.state.va.us

### CERTIFICATE OF SERVICE

      I hereby certify that on December 23, 2020, a true and accurate copy of this paper was filed electronically with the Court's CM/ECF system, which will then send a notification of such filing to the parties.

                 */s/  Blaire Hawkins O'Brien*
                 Blaire H. O'Brien